UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| EQT GATHERING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 12-58-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| A TRACT OF PROPERTY SITUATED | ) | **OPINION AND ORDER** |
| IN KNOTT COUNTY, KENTUCKY, | ) | |
| *Corresponding to Property Tax Map* | ) | |
| *Number 87, Parcel 47 (160 acres)*, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

The parties have agreed on very little during the course of this condemnation action. The three pending motions are no exception. For the reasons given below, EQT has standing to bring this condemnation action and there is no reason to doubt the constitutionality of the statute that grants EQT condemnation authority. However, there is reason to doubt whether EQT meets the requirements in that statute, so summary judgment in its favor is not appropriate. For that reason, this case must proceed to a trial on the question whether EQT has the authority to condemn the property named in its complaint.

**BACKGROUND**

EQT Gathering, LLC, a company that constructs, maintains, and operates natural gas pipelines, filed this diversity condemnation action under Federal Rule of Civil Procedure 71.1 to acquire rights of way on 160 acres of property in Knott County, Kentucky. Compl.,

R. 1 ¶¶ 1, 4, 13. EQT alleges that it needs the rights of way to maintain and operate an existing pipeline—the Mayking Node 3—that crosses the land. *Id.* at ¶ 6.

EQT's pipeline runs through a certain piece of property whose owners want the pipeline gone. In 2009, the property owners sued EQT and other defendants in the Knott County Circuit Court claiming that the pipeline was a trespass under Kentucky law. The state court defendants tried to resolve the trespass case in several ways. First, they moved for summary judgment on the merits question. They argued that they hold property rights giving them the right to build and maintain the pipeline, so they had not trespassed. R. 23-9. Second, they tried to settle the case in mediation. R. 59-4. Finally, they moved for summary judgment on the damages question. They argued that because some of the defendants have condemnation authority under Kentucky law, damages were limited to what the property owners could receive in an inverse condemnation action. R. 23-12. Their efforts were unsuccessful. R. 44-2; R. 44-4.

After the property owners refused EQT's settlement offer, EQT filed this Rule 71.1 condemnation action. R. 1. EQT claims the authority to condemn their property from Ky. Rev. Stat. § 278.502. R. 1 ¶ 13.

Rule 71.1 lays out a two-step process for eminent domain actions. The first step is an expedited determination of the validity of the taking. If the taking is proper, the second step is a determination of just compensation. *See* Memorandum Opinion and Order, R. 37 at 2–3 (describing the stages of a Rule 71.1 action).

This case is still at the first step. The property owners filed two motions, hoping to end this case. The first is a motion to dismiss for lack of standing. R. 41. The second is a

motion to certify the question of the constitutionality of Ky. Rev. Stat. § 278.502 to the Kentucky Supreme Court or to stay the case. R. 45. EQT filed a motion for partial summary judgment on the takings issue, hoping to move the case along to the second step. R. 57. This Court ordered supplemental briefing on the motion to dismiss and held a hearing on the three motions. R. 60; R. 63.

## DISCUSSION

### I. EQT Has Standing To Bring This Rule 71.1 Condemnation Action.

EQT seeks to condemn two categories of property rights. The first category is property rights that EQT has claimed to own as a defense in the state court trespass case. The second category is property rights that EQT does not claim to own. The parties do not agree on which property rights fall into which category.[1] *See* R. 63 at 2. For the purposes of standing, it does not matter. EQT has standing to condemn both categories of property rights.

The familiar concept of standing becomes less familiar in the context of a condemnation action. A plaintiff has standing if he has an injury that is traceable to the defendant and can be redressed by the relief he seeks. *See Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012). A condemnation case is an *in rem* proceeding, meaning it is an action against the property to be condemned. *See United States v. 6.45 Acres of Land*, 409 F.3d 139, 145–46 (3d Cir. 2005). It is not an action against those who have, or might have, an interest in the property to be condemned. *See Cadorette v. United States*, 988 F.2d

---

[1] The complaint lists eleven property rights. R. 1 at 6–7 ¶ 14(a)-(l). Some of those rights relate to the construction of a pipeline. *See id.* ¶ 14(b), (e). Others relate to pipeline use and maintenance. *See id.* at 7 ¶ (f)-(i). And some restrict what others can do to or around the pipeline. *See id.* at 7 ¶ (j)-(k).

215, 222–24 (1st Cir. 1993) (explaining the difference between a condemnation action, which is *in rem*, and a quiet title action, which is *in personam*). So, standing in a condemnation action requires an injury traceable to the property that will be redressed by condemnation.

EQT has standing to condemn the first category of property rights, those that EQT has asserted as a defense to the state court trespass action. EQT and the other defendants asserted various easements, deeds, and mineral rights as a defense to the state court trespass action. R. 61 at 11. There, they argued that they "had a legal right to enter the property and construct the pipeline and therefore their entry was privileged and could not be a trespass." *Id.* The property owners disagreed and claimed ownership over those same rights. R. 23-10 at 3. Based in part on that factual dispute, the state court has denied summary judgment and set the trespass action for trial. R. 23-11; R. 64-1. The existence and scope of EQT's property rights are clearly in dispute in the state trespass case. EQT's injury is the cloud on its title created by the state court trespass case, in other words, the possibility that EQT may lose in state court. This condemnation action can redress that injury by resolving the title dispute in EQT's favor. Because EQT has an injury traceable to the subject property that condemnation can redress, it has standing to bring this condemnation suit.

The property owners' argument to the contrary is misguided. As they see it, EQT cannot have its property rights and condemn them too. If EQT thinks that it already owns the property rights that it seeks to condemn, then it has no injury that condemnation could fix. *See* R. 41-1 at 7–8. As the property owners concede, they have not directed the Court to a case that supports their position. *See* R. 63 at 1. Perhaps the Court should not fault the

property owners for that. After all, how often does this situation—where a party offers to pay good money for something it thinks it owns already—arise? Even so, the property owners' argument is flawed for another reason. Just because EQT believes it should win in the state court trespass action does not mean that it will win. As just explained, the dispute in the state court trespass action is an injury that gives EQT standing. In this way, EQT's injury is not so different than the injury of a plaintiff in a quiet title suit. In a quiet title suit, both parties have asserted some claim to a piece of property, and the court resolves the dispute. There, as here, the injury is the competing claim of ownership. *Cf. Haws v. Short, Ky.*, 304 S.W.2d 924, 925 (Ky. 1957) ("It is fundamental that in an action to quiet title the plaintiff must allege and prove both title and possession.").

EQT's positions in the state court trespass action and this condemnation action can be thought of as an alternative pleading, one that takes place across two cases. *See United States v. San Geronimo Dev. Co.*, 154 F.2d 78, 82–83 (1st Cir. 1946) (describing the United States' claim that it held a valid lease to certain property that it also sought to condemn as an alternative pleading). The property owners concede that they have not provided the Court with any authority for their argument that such an alternative pleading presents a standing problem. R. 63 at 1. The Supreme Court sanctioned the tactic in *United States v. 93.970 Acres of Land*, 360 U.S. 328 (1959). There, the United States argued that it had validly revoked a lease, meaning the condemnee had no interest in the subject property. *See id.* at 329–30. The United States also sought to condemn the lease, just in case. *See id.* at 330. The Supreme Court held that the United States could raise both arguments in one cause of action and did not mention standing. *See id.* at 332; *cf. United States v. Hays*, 515 U.S. 737,

742 (1995) (explaining that "federal courts are under an independent obligation" to ensure the parties before them have standing).

EQT also has standing to condemn the second category of property rights, those that it does not claim to own already. The reason for this is simple. EQT claims that it needs those property rights to maintain the pipeline, and the property owners have not disputed that claim. So, the lack of those property rights is an injury that condemnation would redress.

In sum, EQT has standing to condemn both the property rights that it claims to own as a defense to the state court trespass action and the property rights that it does not claim to own. For that reason, the property owners' motion to dismiss for lack of standing will be denied.

II.     **Certification of the Question Whether Section 278.502 is Constitutional Is Not Appropriate.**

The property owners moved to certify the question whether Ky. Rev. Stat. § 278.502 violates the Kentucky Constitution as applied in this case. R. 45. Kentucky Rule of Civil Procedure 76.37(1) permits a federal district court to certify "questions of law" to the Kentucky Supreme Court only where "it appears to the party or the originating court that there is no controlling precedent in the decisions of the [Kentucky] Supreme Court and the Court of Appeals." The Kentucky courts have repeatedly upheld the constitutionality of section 278.502. So, certification is inappropriate.

In an earlier motion to dismiss, the property owners claimed that the constitutionality of section 278.502 was an open question, and the Court explained that it was not. There, the property owners argued that section 278.502 violated the Kentucky Constitution. They asked

this Court to abstain from hearing the case and let the Kentucky courts hear the challenge. R. 21 at 26–28. The Court explained that the "Kentucky Supreme Court has repeatedly held that § 278.502 (and previous versions of the statute) does not violate the Kentucky Constitution." R. 29 at 9 (citing four cases). As a result, the Court declined to abstain. *Id.*

As the property owners see it, the question is actually open because those Kentucky Supreme Court precedents can be distinguished, are wrong, and will likely be overruled. First, they cite three condemnation-related cases and argue that the Kentucky Supreme Court has not ruled on the constitutionality of section 278.502 in light of those cases. R. 45-1 at 5–6. Next, they claim that that those precedents rest on a shaky foundation. *See id.* at 7–8. Finally, they argue that the trend in the Kentucky courts is to narrow the reach of condemnation statutes like section 278.502. *Id.* at 8–9.

Those arguments do not provide a basis for certification because clear, controlling precedent upheld the constitutionality of section 278.502. Kentucky Rule of Civil Procedure 76.37(1) permits certification only where "there is no controlling precedent in the decisions of the [Kentucky] Supreme Court and the Court of Appeals." Four published decisions of the Kentucky Supreme Court clearly and unquestionably held that section 278.502 is constitutional under the Kentucky Constitution. R. 29 at 9. Such decisions are "controlling" when this court sits in diversity jurisdiction. *See Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) ("In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court."). The property owners' arguments may be reasons why the Kentucky Supreme Court cases were wrongly decided or should be overruled, but they are not reasons why those decisions are not

"controlling precedent" in this case. *See Shaheen v. Yonts*, 394 F. App'x 224, 233 n.7 (6th Cir. 2010) (explaining that federal courts should not "trouble . . . state courts every time an arguably unsettled question of state law comes across our desks").

What's more, the property owners offer only weak arguments to challenge the validity of that controlling precedent. The property owners point to three Kentucky Supreme Court cases, R. 45-1 at 5, none of which are on point. The first held an Act unconstitutional because it allowed a local government to condemn property and convey it to private developers for commercial and industrial uses. *See City of Owensboro v. McCormick*, 581 S.W.2d 3, 7–8 (Ky. 1979). The second held a local ordinance condemning property unconstitutional because no evidence in the record demonstrated that the property was blighted, as required by the relevant condemnation statute. *See Prestonia Area Neighborhood Ass'n v. Abramson*, 797 S.W.2d 708, 712 (Ky. 1990). And the third held that a property owner has a right to repurchase property after a taking when it turns out that the property is not needed. *See Miles v. Dawson*, 830 S.W.2d 368, 371 (Ky. 1991). Stating the holdings of these cases is enough to show that they do not cast doubt on (or even relate to) the constitutionality of section 278.502.

The property owners also appear to move for a stay based on arguments raised in briefs they have filed on other motions in this case and a separate case. *See, e.g.*, R. 45 at 1–3. If the Court excised those referenced documents and added them to the defendant's motion to stay, the motion would exceed the page limit in Local Rule 7.1(d). More importantly, the property owners are asking the Court to cut and paste from three different documents and restructure them into one, coherent brief. That is the job of their counsel, not

the Court.  *See Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir. 2003) (describing such attempts to incorporate arguments by reference as "a pointless imposition on the court's time" and explaining that parties "must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record" (quoting *DeSilva v. DiLeonardi*, 181 F.3d 865, 866–67 (7th Cir. 1999))).  So, the Court will not consider the arguments made in those cross-referenced documents.

Finally, the property owners ask the Court to stay the case and allow the state court to resolve the trespass action first.  R. 45-1 at 13–16.  The property owners point out that the state court trespass action could resolve the title question.  They suggest that if that question is resolved in EQT's favor, EQT might drop this condemnation suit.  In light of that possibility, the Court should stay this case to avoid wasting resources.  *Id.* at 16.  In response, EQT has stated on the record that it seeks more property rights in this condemnation action than it claims to own in the state court trespass action.  R. 63 at 2.  For that reason, the state court trespass action will not eliminate the need for this condemnation action.  And this Court has already explained that a similar or related action in state court "does not generally bar a plaintiff from filing suit in federal court."  R. 29 at 5 (citing *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  In response to the property owners' first motion to stay, the Court addressed the many abstention doctrines raised in that motion and explained why they did not apply in this case.  *See id.* at 6–10.  This second request includes no new arguments, so the Court's earlier explanations still apply.

For these reasons, the Court will not certify the question whether section 278.502 violates the Kentucky Constitution or stay this case in favor of the state court trespass action.

### III. Summary Judgment in Favor of EQT Is Not Appropriate.

To prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact in dispute. *See* Fed. R. Civ. P. 56. The moving party bears the initial burden of explaining why it believes that standard has been met. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then respond with "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56(e)). The Court then decides whether there is "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When making that decision, the Court views the evidence and draws "all justifiable inferences" in favor of the nonmoving party. *Id.* at 255. A mere "scintilla" of evidence in support of the non-moving party's position is insufficient to defeat summary judgment. *Id.* at 251.

EQT filed a motion for partial summary judgment on the question of its authority to condemn the subject property under section 278.502. R. 57. Section 278.502 contains several requirements a pipeline company must meet before it may invoke eminent-domain authority. The property owners argue that summary judgment is inappropriate because EQT has not met three of those requirements. R. 58. The property owners have raised a genuine issue of material fact as to two of those requirements, so summary judgment is inappropriate at this time.

Section 278.502 grants condemnation authority to pipeline companies under certain conditions. The statute reads:

> Any corporation or partnership organized for the purpose of, and any individual engaged in or proposing to engage in, constructing, maintaining, or operating oil or gas wells or pipelines for transporting or delivering oil or gas, including oil and gas products, in public service may, if it is unable to contract or agree with the owner after a good faith effort to do so, condemn the lands and material or the use and occupation of the lands that are necessary for constructing, maintaining, drilling, utilizing, and operating pipelines . . . .

Ky. Rev. Stat. § 278.502. The property owners argue that: (1) EQT is not a pipeline company "in public service;" (2) EQT did not engage in a "good faith effort" to purchase their land; and (3) condemning their property is not necessary. R. 58 at 3–5, 9–12. The defendants' second and third arguments raise a genuine issue of material fact.[2]

**The Public Service Requirement**: By statute, Kentucky has declared that the transportation of natural gas by a common carrier is a public service. The property owners do not contest that EQT is both a common carrier of natural gas and a public service company under Kentucky law. *See* Ky. Rev. Stat. §§ 136.120, 278.470; *see also* R. 57-6. The Kentucky Legislature has determined that the transportation of natural gas by a common carrier is in the public service. *See id.* § 416.675(2)(d) (declaring that "the use of property for the . . . operation of public utilities or common carriers" is a public use for the purpose of condemnation). Thus, the Mayking Node 3 pipeline is in the "public service." *See Milam v. Viking Energy Holdings, LLC*, 370 S.W.3d 530, 533–35 (Ky. Ct. App. 2012) (holding that a

---

[2] The parties disagree on the burden of proof in this case. Kentucky law governs the burden of proof in diversity actions such as this case. *See Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 191 F.3d 675, 681 (6th Cir. 1999). In *Henderson v. City of Lexington*, 111 S.W. 318 (Ky. 1908), the Kentucky Supreme Court distinguished between condemnations by a governmental entity and a private entity. When the condemnor is the government, the taking is presumed to be necessary for a public purpose. *Id.* at 322. When the condemnor is a private entity, "it must, if the matter is put in issue, affirmatively show by evidence that the property is needed for its use in the performance of its duties to the public." *Id.* EQT argues that the property owners bear the burden of disproving the taking's validity in this case, but it relies only on cases that deal with takings by government entities. R. 57-1 at 11. The burden of proof is on EQT because *Henderson* has not been overruled.

common carrier that transported natural gas for public consumption was operating in the "public service" under section 278.502).

The property owners argue that this Court cannot rely on these statutory findings but must instead independently assess whether this particular pipeline will be a public use. R. 58 at 3–9. The first problem with their argument is that it is not on point. Section 278.502 creates a set of *statutory* requirements that a pipeline must meet before it can exercise condemnation authority. The property owners do not argue that EQT has not met those statutory requirements. Instead, they argue that the requirements in section 278.502 are not enough to ensure that all condemnations under the statute meet the *constitutional* requirements for a taking. In other words, they concede that EQT has condemnation authority under the statute but believe that the grant of authority is unconstitutional. The proper place for that argument is a cross-motion for summary judgment. The property owners have not filed such a motion, and the time to do so has passed. The second problem is that section 278.502 has repeatedly been upheld against similar constitutional challenges. *See* R. 29 at 9. The property owners cite several cases and claim that those cases require condemned property be fully open to the public for that property to be in the public use. R. 58 at 4–8 (citing *McCormick*, 581 S.W.2d 3, and *Henderson v. City of Lexington*, 111 S.W. 318 (Ky. 1908)). But those cases stand only for the uncontroversial proposition that property cannot be constitutionally condemned unless it will be put to a public use. Not only does the property owners' argument lack precedential support, it lacks logical support. Highly regulated pipelines that carry highly flammable materials need not be fully open to the public to be a public use. EQT permits other natural gas companies to use their pipeline to transport

natural gas. R. 57-2 at 3; R. 59-1. So, the Mayking Node 3 pipeline is available for public use by the portion of the public relevant here—natural gas transportation companies.

**The Good Faith Requirement**: Under section 278.502, a natural gas pipeline company does not have condemnation authority unless "it is unable to contract or agree with the owner after a good faith effort to do so."

The parties have introduced conflicting affidavits on the issue of whether EQT offered to purchase the property owners' property outright before filing this condemnation action.[3] EQT filed an affidavit by Kimberly McCann, its counsel in both the state trespass case and this case. R. 57-3. In that affidavit, Ms. McCann states that she extended an initial offer of $90,000 to purchase the property rights at issue in this case and later increased that offer. R. 57–3 at 2. EQT also filed a copy of the letter it sent to the defendants offering to purchase an easement and settle the defendants' claims. R. 59-4. The property owners filed an affidavit by Adam Collins, their attorney in the state trespass action. Mr. Collins states that EQT never offered to purchase the same property rights that it seeks to condemn in this action. R. 58-1 at 2.

The good faith requirement in section 278.502 appears to require at least one offer to purchase the property to be condemned. This Court found only one case interpreting the "good faith effort" requirement in section 278.502. *See Milam*, 370 S.W.3d at 535–36 (finding that company that attempted to negotiate complied with the "good faith effort"

---

[3] The following facts are not in dispute. EQT and the property owners attended a mediation session on June 13, 2012. During that mediation, the parties discussed settling the trespass action. R. 57-3 (Kimberly McCann Affidavit); R. 58-1 (Adam Collins Affidavit). The property owners' initial demand was $6 million, which was rejected. R. 57-3 at 2; R. 58-1 at 2. Later that day, EQT filed this condemnation suit in light of the property owners' refusal of what EQT believed to be "reasonable settlement offers." R. 57-3 at 2; R. 1 (complaint filed on June 13, 2012).

requirement). The general Kentucky Eminent Domain Act contains an analogous "reasonable effort" requirement. Ky. Rev. Stat. § 416.550. To satisfy that requirement, the would-be condemnor must have made "an effort to effect a contract of purchase satisfactory to the condemnor." *Usher & Gardner, Inc. v. Mayfield Indep. Bd. of Ed.*, 461 S.W.2d 560, 562–63 (Ky. 1970) (reading a "good faith" requirement into Ky. Rev. Stat. § 162.030, which grants local school boards eminent domain authority); *see also Parker v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, No 2011-CA-000549-MR, 2012 WL 1556388, at *1–*2 (Ky. Ct. App. May 4, 2012) (summarizing case law and explaining that the condemnor must at least offer to buy the property at issue). Thus, at least one purchase offer is required to constitute "good faith" under section 278.502.

At this stage, however, summary judgment would be improper. This Court cannot weigh EQT's affidavit and filing against the property owners' affidavit and determine which is more credible. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited."). The conflicting affidavits therefore raise a genuine issue of material fact as to whether EQT offered to purchase the same property that it seeks to condemn from the property owners before filing this condemnation action. Therefore, summary judgment on the takings issue in EQT's favor is not appropriate.

**The Necessity Requirement**: Section 278.502 grants natural gas pipeline companies the authority to condemn only the property that is "necessary for constructing, maintaining, drilling, utilizing, and operating pipelines." Necessity is a flexible term. *See Petroleum Exploration v. Hensley*, 213 S.W.2d 262, 263 (Ky. 1948) ("The question is: In the light of the

facts here, is the course as desired a practical necessity?"). The property owners claim that condemnation is not necessary for four reasons, one of which raises a genuine issue of material fact that precludes summary judgment.

First, the property owners argue that EQT can simply relocate the pipeline off the defendants' property instead of condemning that property. R. 58 at 9–10. In support, the property owners point to an affidavit from a contractor stating that he would be willing to move the pipeline for $50,000. *Id.* That affidavit is not part of the record because it was filed in a separate case and the property owners have not filed it in this case. Even if it were, the affidavit shows only that one person would be willing to move the pipeline for a certain amount. But whether relocating the pipeline is *possible* is irrelevant. As this Court has already explained, the relevant issue is whether "it is at least plausible that condemnation is a practical necessity." R. 29 at 12.

EQT has established that relocation of the pipeline is impractical in this case. EQT has filed an affidavit from Samuel Smallwood, the Regional Director of Land. R. 57-2. Mr. Smallwood states that the current pipeline location was chosen because it minimized the cost of the project, the impact on the surrounding properties, and the risk of "slides and slippages" that might cause "line ruptures and safety concerns." *Id.* at 2. The property owners have not challenged his assessment. So, although it is possible to relocate the pipeline, doing so involves serious costs and risks. Condemning the property owners' property in order to keep the pipeline in its current location is therefore a practical necessity.

Second, the property owners claim that EQT manufactured any necessity for condemnation by purposefully placing the pipeline on their property. R. 58 at 11–12. In

support of that claim, the property owners point to an affidavit from Jeffrey L. Hall that was filed in a separate case. *See Hall v. EQT Gathering, LLC*, Pikeville Civil No. 12-145 (E.D. Ky. 2013), R. 12-3. In that affidavit, Hall describes a conversation that he had with Steve Burgess, one of EQT's agents, while the pipeline was being built. Burgess told Hall that his supervisors told him that EQT knew the pipeline was being built on the property owners' properties but did not want to correct the mistake. *Id.* at 2. Instead, Burgess's supervisors told him that EQT preferred to wait until they sued in trespass. *Id.*

At summary judgment, the Court may not consider these statements unless they are admissible. That is a problem for the property owners, because the Hall affidavit contains double-hearsay. Hearsay is a statement that the declarant "does not make while testifying at the current trial or hearing" and that is offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The first level of hearsay is Hall's statement that Burgess (the declarant) told him about Burgess's supervisors' intentions. The second level of hearsay is Burgess's statement that his supervisors (the declarants) told him that EQT intentionally located the pipeline on the property owners' property. There is an exception for hearsay statements by a company's employees that are offered against an opposing party. Fed. R. Evid. 801(d)(2). To qualify for the exception, those statements must either be (1) "made by a person whom the party authorized to make a statement on the subject" or (2) be "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(C)–(D). For a double-hearsay statement like this one "to be admissible, each separate statement must . . . fall within a hearsay exception." *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 578 (6th Cir. 2012). As the party seeking to admit the

double-hearsay statement, the property owners bear the burden of demonstrating that the statement falls within an exception to the hearsay rule. *See Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002).

The second statement by Burgess's supervisors does not fall within the exception, so the entire double-hearsay statement is inadmissible. The Hall affidavit does not identify the names, titles, or job responsibilities of Burgess's supervisors. Without that information, this Court cannot find that those supervisors' statements were either authorized or concerned matters within the scope of their relationship with EQT. Put another way, this Court has no way of knowing whether Burgess's supervisors were involved in the decision about where to locate the Mayking Node 3 pipeline or were just privy to some water-cooler gossip about the pipeline. *See Back*, 694 F.3d at 577–78 (holding that a double-hearsay statement was inadmissible where there was no evidence that the unidentified declarants were speaking on a matter within their scope of employment). Because the statements by Burgess are double hearsay, this Court cannot consider them on summary judgment.

Third, the property owners claim that EQT's failure to realize that the pipeline was located on their property until 2012 is evidence that EQT recklessly built the pipeline on their land. R. 58 at 12. Their description of events is misleading. The uncontested affidavit of Samuel Smallwood states that EQT "believed that the line would be constructed on . . . property for which it had obtained . . . right of way agreements." R. 57-2 at 2. The pipeline was built in 2008, and EQT does not dispute that it made a mistake and actually constructed the pipeline on the defendants' land. R. 1 at 5; R. 57-1 at 3–4. The property owners sued EQT and the other state court defendants in 2009. R. 57-1 at 4 n.2. The state court

double-hearsay statement, the property owners bear the burden of demonstrating that the statement falls within an exception to the hearsay rule. *See Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir. 2002).

The second statement by Burgess's supervisors does not fall within the exception, so the entire double-hearsay statement is inadmissible. The Hall affidavit does not identify the names, titles, or job responsibilities of Burgess's supervisors. Without that information, this Court cannot find that those supervisors' statements were either authorized or concerned matters within the scope of their relationship with EQT. Put another way, this Court has no way of knowing whether Burgess's supervisors were involved in the decision about where to locate the Mayking Node 3 pipeline or were just privy to some water-cooler gossip about the pipeline. *See Back*, 694 F.3d at 577–78 (holding that a double-hearsay statement was inadmissible where there was no evidence that the unidentified declarants were speaking on a matter within their scope of employment). Because the statements by Burgess are double hearsay, this Court cannot consider them on summary judgment.

Third, the property owners claim that EQT's failure to realize that the pipeline was located on their property until 2012 is evidence that EQT recklessly built the pipeline on their land. R. 58 at 12. Their description of events is misleading. The uncontested affidavit of Samuel Smallwood states that EQT "believed that the line would be constructed on . . . property for which it had obtained . . . right of way agreements." R. 57-2 at 2. The pipeline was built in 2008, and EQT does not dispute that it made a mistake and actually constructed the pipeline on the defendants' land. R. 1 at 5; R. 57-1 at 3–4. The property owners sued EQT and the other state court defendants in 2009. R. 57-1 at 4 n.2. The state court

defendants could not enter the property owners' land to survey the pipeline until 2012, when they secured a state court order allowing them to access the land. R. 57-1 at 4. EQT clearly made a mistake when it constructed its pipeline on the property owners' land. But there is no evidence that the mistake was made "capriciously or wantonly" that would defeat EQT's claim of necessity. *Hensley*, 213 S.W.2d at 263.

Finally, in an encore performance of their standing argument, the property owners argue that to the extent that EQT owns any of the property rights that it seeks to condemn, condemnation is not necessary. R. 58 at 9. The property owners make this argument in a few sentences, and EQT replies in kind. R. 59 at 10. As a matter of logic, the property owners are correct: a condemnor cannot take what it already owns. And this makes sense, after all what would EQT do, write itself a check for the property condemned?[4] But, the property owners did not affirmatively move for summary judgment.[5] Rather, they are simply

---

[4] One counterargument is that a condemnation action gives the condemnor a perfect title, one that is good against all who may come forward in the future. But, EQT has not alleged, or even implied, that there are any other parties that might come forward. Instead, the only identified parties with an interest in the property are the property owners and EQT.

The dispute over current ownership makes this case different than so-called "friendly condemnation" cases. There, the condemnee agrees to sell the property to the condemnor for a certain amount, but the condemnor is concerned about defects in the condemnee's title. The condemnor institutes condemnation proceedings so that it can hold perfect title as against anyone with an interest in the property. Just compensation is awarded in the amount agreed to by the condemnor and condemnee. *See United States v. Certain Parcels of Land in Fairfax Cnty.*, 345 U.S. 344, 348 (1953). In those cases, condemnation is not strictly necessary, in that the condemnor could probably get by on the basis of the agreement with the condemnee. However, the condemnor is still allowed to bring condemnation proceedings so that it can gain a perfect title. *See id.*; *see also Straight Creek Coal Mining Co. v. Straight Creek Coal & Coke Co.*, 122 S.W. 842, 843 (Ky. 1909) (describing a friendly condemnation proceeding). The condemnor in a friendly condemnation case still needs to gain title, whereas EQT might hold title to some of the property it seeks to condemn.

[5] The property owners also did not move to dismiss on this ground, which they probably could have done on the property EQT already owns. *See Virginia Elec. & Power Co. v. King*, 130 S.E.2d 318, 320 (N.C. 1963); *Grand River Dam Auth. v. Simpson*, 136 P.2d 879, 881 (Okla. 1943); *Houston N. Shore Ry. Co. v. Tyrrell*, 98 S.W.2d 786, 794 (Tex. 1936); *In re City of Yonkers*, 23 N.E. 661, 663 (N.Y. 1890). While logic seems to indicate that a condmnor cannot condemn its own property, some courts have suggested otherwise. *See 93.970 Acres of Land*, 360 U.S. at 332; *United States v. 300 Units of Rentable Hous., Located on Approx. 57.81 Acres*

trying to stop EQT from obtaining summary judgment. As such, the Court can only do what it is already doing—deny EQT summary judgment. So while the argument may assist the property owners down the road (i.e., if they move for a directed verdict on this ground), the argument provides them nothing more at this point.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1) The property owners' motion to dismiss for lack of standing, R. 41, is **DENIED**.

(2) The property owners' motion to certify or to stay, R. 45, is **DENIED**.

(3) The plaintiff's motion for partial summary judgment, R. 57, is **DENIED**.

(4) The Court will enter a separate Order setting pretrial deadlines and a trial date for the bench trial on the takings issue.

This the 26th day of August, 2013.



Signed By:
Amul R. Thapar  AT
United States District Judge

---

of Eielson Air Force Base, 668 F.3d 1119, 1124 (9th Cir. 2012); *United States v. Turner*, 175 F.2d 644, 647–48 (5th Cir. 1949); *see also Fowler v. City of Warm Springs*, 519 S.E.2d 703, 705 (Ga. Ct. App. 1999); *see also Shoemaker v. Dep't of Transp.*, 241 S.E.2d 820, 823 (Ga. 1978); *Ketchum Coal Co. v. Dist. Court of Carbon Cnty.*, 159 P. 737, 742 (Utah 1916). The Court, however, need not resolve this issue since the property owners neither moved to dismiss nor for summary judgment.